[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-10359
Non-Argument Calendar

_____

D. C. Docket No. 05-00136-CV-ORL-DAB

CENTIMARK CORP.,

Plaintiff-Appellee,

versus

A TO Z COATINGS & SONS, INC.,
a Georgia corporation,
A TO Z COATINGS, INC.,
a Florida corporation,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 30, 2008)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

In this commercial dispute, defendants A to Z Coatings & Sons, Inc. ("A to Z Georgia") and A to Z Coatings, Inc. ("A to Z Florida") appeal from a bench trial verdict and final judgment of $168,434.36 in favor of plaintiff Centimark Corporation ("Centimark"). After review, we affirm.

## I. BACKGROUND

Plaintiff Centimark is a roofing contractor. Defendant A to Z Georgia is a now defunct, family-owned, Georgia corporation, but it performed a series of roof-coating jobs for Centimark in 2001 and 2002. A to Z Georgia informally dissolved and ceased doing business in approximately December 2004.

Centimark filed this lawsuit in January 2005. Centimark's amended complaint sought approximately $230,000 in damages as a result of A to Z Georgia's failure to provide acceptable coatings on four jobs that Centimark subcontracted to A to Z Georgia in 2001 and 2002. Centimark further contended that defendant A to Z Florida was liable for those damages as A to Z Georgia's successor corporation. As explained in more detail below, A to Z Georgia and A to Z Florida were owned and operated by three members of the Robb family: Teresita Robb ("Teresita"), Gerald Robb, Sr., ("Senior"), and Gerald Robb, Jr. ("Junior").

After a bench trial, the court[1] found for Centimark and entered judgment for $168,434.36 against A to Z Georgia and A to Z Florida, jointly and severally. The court determined that A to Z Georgia was liable to Centimark for two of the four jobs at issue, and that A to Z Florida was also liable to Centimark for those jobs as A to Z Georgia's successor.

Preliminarily, the court observed that A to Z Georgia had a default judgment entered against it for failure to answer Centimark's complaint, but that A to Z Florida had appeared and defended against both liability and damages. In light of A to Z Florida's timely appearance and challenge to A to Z Georgia's liability, the court decided to ignore the default judgment and determined that A to Z Georgia would receive the benefit of A to Z Florida's challenge to liability, if that challenge proved successful.

However, A to Z Florida's challenge to liability did not prove entirely successful. On the merits, the court found that A to Z Georgia had agreed to coat the Taylor Wharton commercial building for Centimark, and that A to Z Georgia was paid for that work. The court further found that the Taylor Wharton roof leaked in certain spots; that A to Z Georgia had promised to provide "a roof that didn't leak"; and that Centimark incurred a total cost of $108,434.36 in dealing

[1]The parties consented to trial before a federal magistrate judge. We refer to the magistrate judge as the "court."

3

with the leaky roof. Accordingly, the court found that A to Z Georgia was liable to Centimark for $108,434.36.

The court also found that A to Z Georgia had agreed to coat and install a foam roof on the Talla-Com commercial building for Centimark, and that A to Z Georgia was paid for that work as well. The court further determined that the foam on the Talla-Com roof cracked and Centimark was forced to fix the problem at a cost of $60,000; the parties had an "oral agreement, followed by a purchase order and an invoice," for the Talla-Com project; and A to Z Georgia was liable to Centimark for the $60,000 that Centimark incurred in repair costs.

Finally, the court found that A to Z Florida was liable to Centimark as A to Z Georgia's successor corporation. The court determined that A to Z Florida was a mere continuation of A to Z Georgia, due to the similar principals, similar nature of the businesses, the timing of A to Z Florida's incorporation, and other evidence we discuss later. A to Z Georgia and A to Z Florida timely appealed.[2]

## II. DISCUSSION

**A.    Pleading deficiencies**

First, we address defendants' contention that Centimark's amended

---

[2]After a bench trial, we review a trial court's findings of fact for clear error and its conclusions of law de novo. See A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir. 2003).

complaint did not set forth sufficient allegations to provide a legal basis for the default judgment against A to Z Georgia, such that the judgment against both A to Z Georgia and A to Z Florida must be reversed. The problem with this argument is that the court disregarded the default judgment against A to Z Georgia and actually tried the case as to A to Z Georgia's liability, because A to Z Florida timely appeared to challenge A to Z Georgia's liability. Instead of relying on the default judgment, the court specifically determined that A to Z Georgia agreed to provide non-faulty roofs for Centimark on the Taylor Wharton and Talla-Com jobs; that A to Z Georgia failed to do so; and that A to Z Georgia was liable to Centimark for the resulting damages of $168,434.36.[3]

Moreover, to the extent defendants argue that Centimark pled only a cause of action for breach of written contract, such that the court's judgment cannot stand, we disagree. Centimark's amended complaint pled three distinct causes of action: (1) breach of contract, based on an April 2002 written agreement that Centimark attached to its original complaint; (2) breach of warranty, based on Centimark having contracted in 2001 for A to Z Georgia to coat Centimark's roofs and A to Z Georgia having performed defective and faulty coating work; and (3)

---

[3]In contrast, had the court entered judgment based on A to Z Georgia's default, A to Z Georgia would be liable for all of the jobs referenced in the amended complaint and not merely the Taylor Wharton and Talla-Com jobs.

unjust enrichment, based on Centimark having paid A to Z Georgia for coating work on those roofs despite A to Z Georgia's improper performance of that work.

The court's order does not specify the precise basis for its grant of relief to Centimark, but it does make clear that the judgment is not based on the April 2002 written contract. The court's order recognized (1) that all but one of the four coating jobs pre-dated the April 2002 contract, and (2) that as to the one post-April 2002 job (Talla-Com), the April 2002 contract was "woefully incomplete" and lacked "essential terms," such that the Talla-Com job was governed by an oral agreement between the parties and not the April 2002 contract. Instead of relying on the April 2002 written contract, the court's order found the parties had proceeded as they always had, with oral agreements for roof coating work followed by purchase orders and invoices.

Furthermore, as to Centimark's breach of warranty and unjust enrichment counts, defendants' initial brief on appeal does not seriously challenge the court's underlying determination that A to Z Georgia was obligated to provide non-leaky roofs (at the Taylor Wharton and Talla-Com sites) and failed to do so. See United States v. Gupta, 463 F.3d 1182, 1195 (11th Cir. 2006) (stating that if a party fails to provide arguments on the merits of an issue and makes only passing reference to the issue in its briefs, the argument is waived), cert. denied, 127 S. Ct. 2446 (2007).

6

In any event, the trial evidence supports the court's judgment that A to Z Georgia agreed to provide non-leaky roofs but failed to do so. Even Senior—the Vice President of A to Z Georgia—acknowledged that Centimark was "attempting to get a roof which did not leak"; that a non-leaky roof was the "basis of the agreement" between the parties; and that a non-leaky roof was what A to Z Georgia was "going to provide." Testimony of Gerald Robb, Sr., at 144 (discussing the Taylor Wharton building); see also Testimony of James Esterly, at 68, 71, 75 (explaining that Centimark hired A to Z Georgia to provide a leak-free roof for the Talla-Com building but the roof continually leaked). Moreover, A to Z Georgia was paid $174,132 for its work on the Taylor Wharton building and $260,000 for its work on the Talla-Com building, despite having provided leaky roofs.

In short, there was ample evidence to support the court's determination that the parties proceeded, as they always had, on oral agreements for non-leaky roofs; that Centimark fully paid A to Z Georgia for non-leaky roofs; that the roofs leaked; and that A to Z Georgia was liable to Centimark for $168,434.36. At a minimum, Centimark proved a viable unjust enrichment claim, and defendants have failed to show any reversible error in the judgment against them. See W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc., 728 So. 2d 297, 300, 303 (Fla. Dist. Ct. App. 1999) (detailing the elements of breach of oral contract and unjust

7

enrichment under Florida law).[4]

## B.    Successor liability of A to Z Florida

Defendants argue that even if A to Z Georgia is liable to Centimark, the court erred in finding A to Z Florida liable to Centimark as A to Z Georgia's successor.  We disagree.

Under Florida law, a predecessor corporation's liability may be imposed on its successor corporation if: (1) the successor assumes the obligations of the predecessor; (2) the transaction is a de facto merger; (3) the successor is a mere continuation of the predecessor; or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor.  See Bernard v. Kee Mfg. Co., 409 So. 2d 1047, 1049 (Fla. 1983); Lab. Corp. of Am. v. Prof'l Recovery Network, 813 So. 2d 266, 269 (Fla. Dist. Ct. App. 2002).  On appeal, Centimark argues only for the third type of successor liability and asserts that A to Z Florida is a mere continuation of A to Z Georgia.[5]

_____

[4]The court applied Florida law, and the parties agree that Florida law governs this dispute.  Accordingly, we apply Florida law.  To prove unjust enrichment, a plaintiff must establish facts that demonstrate: (1) that a benefit was conferred upon and flowed to the defendant; (2) that the defendant either requested the benefit or knowingly and voluntarily accepted it; and (3) that under the circumstances, it would be inequitable for the defendant to retain the benefit without paying the value thereof.  W.R. Townsend, 728 So. 2d at 303.  Because Centimark's unjust enrichment claim supports the judgment, we need not examine whether, under Florida law, Centimark also proved a breach of implied warranty claim arising from the oral promises.

[5]The court found the alter ego theory of successor liability inapplicable to A to Z Florida and instead found A to Z Florida liable under the mere continuation theory.  In its appeal brief,

8

"The concept of continuation of business arises where the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name." Amjad Munim, M.D., P.A. v. Azar, 648 So. 2d 145, 154 (Fla. Dist. Ct. App. 1994). "The key element of a continuation is a common identity of the officers, directors and stockholders . . . ." Id. Mere continuation

> occurs when one corporation is absorbed by another, i.e., there is a continuity of the [first] corporation evidenced by such things as the same management, personnel, assets, location and stockholders. The bottom-line question is whether each entity has run its own race, or whether[] there has been a relay-style passing of the baton from one to the other.

Id. (quotation marks, ellipses, and citations omitted); see also Lab Corp., 813 So. 2d at 270 ("While having common attributes does not automatically impose liability on a successor corporation, merely repainting the sign on the door and using new letterhead certainly gives the appearance that the new corporation is simply a continuation of the predecessor corporation.").

At trial, Centimark established that A to Z Georgia and A to Z Florida were both "family businesses" and essentially "nobody else" worked for the companies besides the Robb family. As to A to Z Georgia, Teresita owned 51% of the stock and was the Secretary/Treasurer. Her stepson, Junior, owned 49% of the stock and

Centimark focuses only on mere continuation. Accordingly, we address only mere continuation.

9

was the CEO. Teresita's husband and Junior's father, Senior, previously owned a 49% share, but transferred his share to Junior prior to the events in this case. However, Senior remained employed by A to Z Georgia as its Vice President, and he personally worked on the Taylor Wharton and Talla-Com jobs at issue in this case. At some point, Teresita and Senior moved, leaving Georgia for Florida, and A to Z Georgia was registered to do business in Florida for a short time.

As to A to Z Florida, in late March 2005—approximately two months after this lawsuit was filed—the Robbs formed A to Z Florida.[6] At the time of A to Z Florida's incorporation, Teresita owned 49% of its stock, and Senior owned 51%.[7] Teresita is A to Z Florida's Secretary/Treasurer, while Senior is its President.[8]

In summary, Centimark's evidence showed that: (1) the Robbs owned A to Z Georgia and A to Z Florida in similar capacities; (2) Teresita, Junior, and Senior were the officers and directors of A to Z Georgia; (3) Teresita and Senior were the officers and directors of A to Z Florida; (4) purchase orders from A to Z Georgia were sometimes issued in A to Z Florida's name; (5) Senior and Junior still worked

---

[6]Centimark's original complaint named only A to Z Georgia as a defendant. Thereafter, Centimark discovered that A to Z Georgia had ceased doing business and that the Robbs had incorporated A to Z Florida in March 2005, and in May 2005, Centimark filed its amended complaint naming both A to Z Georgia and A to Z Florida as defendants.

[7]Teresita is now the sole shareholder of A to Z Florida.

[8]Junior is neither a shareholder nor an officer of A to Z Florida.

jointly on jobs even after A to Z Georgia ceased doing business, with Junior going to Florida frequently in the winter and Senior going to Pennsylvania frequently in the summer;[9] (6) the Robbs personally owned a lot of the A to Z companies' fixed assets and leased the equipment to the companies; (7) A to Z Florida and A to Z Georgia performed the same type of work and provided the same type of services; (8) from the perspective of the former A to Z Georgia Director of Operations (who moved to Florida with Senior and Teresita), "there were no changes" in day-to-day operations even after A to Z Georgia ceased doing business in December 2004 and A to Z Florida was incorporated in March 2005;[10] and (9) A to Z Florida did not even bother to use "new letterhead" upon its formation, cf. Lab Corp., 813 So. 2d at 270, and instead, in October 2005, several months after A to Z Georgia discontinued its operations and A to Z Florida was incorporated, the Robbs were still using A to Z Georgia's stationery.

This wealth of evidence establishes that A to Z Georgia and A to Z Florida had great overlap in their officers, directors, personnel, assets, and stockholders,

_____

[9]Junior moved to Pennsylvania in approximately 1999-2000, and A to Z Georgia was registered to do business in Pennsylvania for a short time prior to its December 2004 dissolution. In January 2005, Junior formed A to Z Coatings, Inc., a Pennsylvania corporation ("A to Z Pennsylvania"). A to Z Pennsylvania is not a party to this lawsuit.

[10]Richard Schwenk was A to Z Georgia's Director of Operations and one of the few non-Robbs who worked for the A to Z companies. He left the Robbs' employ in October 2005 (seven months after A to Z Florida's incorporation) and testified that as far as he knew, even after A to Z Florida's incorporation, he was still an employee of A to Z Georgia.

and accordingly, defendants have not shown that the court erred in finding A to Z Florida liable to Centimark as a mere continuation of A to Z Georgia. See Lab Corp., 813 So. 2d at 270 (stating that to avoid successor liability, the successor "corporation must not merely be a 'new hat' for the [predecessor] corporation, with the same or similar entity or ownership") (quotation marks and citation omitted); Amjad Munim, 648 So. 2d at 154 (stating that mere continuation is shown "by such things as the same management, personnel, assets, location and stockholders") (quotation marks and citations omitted).[11]

### III. CONCLUSION

For the foregoing reasons, we affirm the court's verdict and entry of judgment of $168,434.36 in favor of Centimark against A to Z Georgia and A to Z Florida.

**AFFIRMED.**

---

[11]Finally, to the extent that defendants claim Centimark failed to adequately plead successor liability, we reject that argument as well. Centimark's amended complaint gave defendants sufficient notice of the successor liability claim by alleging, inter alia, that "A to Z [Florida] is the alter ego of A to Z [Georgia] as it [is] a mere continuation of the business of the latter," and that A to Z Florida and A to Z Georgia have common shareholders. Amended Complaint, ¶¶ 20-21.

12